# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ARIANA SANTIAGO,<br>*Plaintiff*,<br><br>v.<br><br>KILOLO KIJAKAZI,<br>*Defendant*. | No. 3:21-cv-01422 (VAB) |

## RULING AND ORDER ON MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Ariana Santiago has filed an administrative appeal under 42 U.S.C. § 405(g) against Kilolo Kijakazi, the Commissioner of Social Security ("Commissioner"), seeking to reverse the decision of the Social Security Administration ("SSA"), denying her claim for Title XVI supplemental security income under the Social Security Act. Ms. Santiago has moved to reverse the Commissioner's decision or, in the alternative, remand the case for a new hearing, while the Commissioner has moved to affirm its decision.

For the reasons explained below, Ms. Santiago's motion is **GRANTED**. The Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

From September 2018 to December 2020, Ms. Santiago received treatment from various doctors and physical therapists at St. Mary's Health Center, Hartford Healthcare, UCONN Health, and Access Rehab Centers. She was treated for chronic migraines, back pain, neck pain,

obesity, leg pain, fatigue, and other illnesses. *See, e.g.*, Tr. at 41–42. She was prescribed pain medication for her lower back, right leg, and migraines, among other treatment plans from her doctors. *See, e.g.*, *id.* at 43, 769–70.

Ms. Santiago was also receiving mental health treatment from various doctors, social workers, and nurses primarily at the Wheeler Clinic and St. Mary's Health Center. *See, e.g.*, *id.* at 624–713. She was treated for schizoaffective disorder, PTSD, visual and auditory hallucinations, anxiety, depression, and psychosis, among other illnesses and symptoms. *Id.* at 41–42, 47.

On August 9, 2018, Ms. Santiago filed a Title XVI application for supplemental security income with the Social Security Administration. Tr. at 21, 250. She alleged that her disability began on January 1, 2016. *Id.* at 250. Her application was initially denied on April 10, 2019, *id.* at 112, and then denied on reconsideration on July 17, 2020. *Id.* at 121. On July 27, 2020, Ms. Santiago filed a request for a hearing by an administrative law judge. *Id.* at 129. On January 26, 2021, Ms. Santiago had a hearing with Administrative Law Judge Ryan Alger (the "ALJ") by telephone at which a vocational expert and Ms. Santiago, with the aid of a Spanish language interpreter, testified. *Id.* at 37–55.

On February 10, 2021, the ALJ denied Ms. Santiago's claim for supplemental security income, finding that she had not been disabled within the meaning of the Social Security Act since August 9, 2018, the date her application was filed. *Id.* at 21–31. On March 24, 2021, Ms. Santiago appealed to the SSA Appeals Council for review of the ALJ's decision. *Id.* at 4, 9–14.

On August 27, 2021, The Appeals Council found that there was no basis for changing the ALJ's decision, thereby making the ALJ's decision the Commissioner's final decision. *Id.* at 1–5.

### 1. Ms. Santiago's Testimony

At the time of her hearing before the ALJ, Ms. Santiago was forty years old and living with her adult son and daughter. Tr. at 42–43. She testified that she has a sixth-grade education[1] and does not understand much English. *Id.* She does not drive, and her cousin drives her to medical appointments. *Id.* at 43.

On an average day, Ms. Santiago makes her bed, sweeps, washes the dishes, prepares something to eat, and then lays down to relieve her pain. *Id.* at 46. She said she performs these chores herself but must stop at times due to pain or concentration issues. *Id.* at 46–47. She showers and dresses herself, but if she's feeling tired or dizzy, her daughter sometimes assists her in the bathroom. *Id.* at 48–49. Up to three times a week Ms. Santiago's daughter "helps [her] to lift [her] foot to get in the tub," or, if she feels dizzy or tired, her daughter will "help [her] to get in the tub." *Id.*

Ms. Santiago stated that she suffers from several different types of medical ailments and that "[p]ain, a lack of concentration, and . . . moods" were causing her the most trouble. *Id.* at 43. More specifically, she stated that she had pain her in her lower back and right leg, had daily migraines, and required prescription pain medication. *Id.* The migraines make her sensitive to light and sound and, to alleviate this, she sits in the dark for up to six or seven hours a day. *Id.* at 44.

Ms. Santiago can only stand for about thirty minutes at a time before she starts to feel a "burning . . . throbbing" sensation. *Id.* at 45. She also can only sit for about thirty minutes before

---

[1] The parties dispute, and the evidence does not clarify, how much schooling Ms. Santiago completed. This issue will be addressed more below.

her back and leg start to become numb. *Id.* To lessen the pain, she takes medication and spends most of the time laying down. *Id.* Movement, such as "walk[ing] for a little," sometimes helps to relieve the pain. *Id.* at 46.

Ms. Santiago also suffers from a variety of mental illnesses. She stated she has "post-traumatic stress disorder, bipolar disorder, major depression, anxiety, panic attacks . . . [and] schizophrenia." *Id.* at 47. She cannot be in places where there are large groups of people or where there are men, and she cannot be around her mother. *Id.* at 47. If she needs to go to the grocery store, her daughter accompanies her. *Id.* at 48. Her daughter also helps her with instructions, such as creating a shopping list or following a recipe, because Ms. Santiago will forget things and cannot concentrate. *Id.* at 48.

Due to the foregoing, Ms. Santiago said that she does not think that she could work even a "relatively easy" full time job. *Id.* at 49.  She stated that she likely would not be able to work most of the time because "[she] can't concentrate[,] [she is] in too much pain[,] [she] take[s] medication, and [she] also ha[s] medical appointments." *Id.* Additionally, her mental health symptoms would be triggered if a supervisor was critical of her work. *Id.* at 50.

### 2.  Medical Chronology

In light of Ms. Santiago's extensive medical history, the Court focuses on Ms. Santiago's medical records after her August 9, 2018 application date.

### i.  Pain Treatment

On September 12, 2018, Dr. Erlich treated Ms. Santiago at St. Mary's Health Center for a three-day migraine, anemia, knee pain, and asthma. Tr. at 522. The doctor noted that Ms. Santiago's migraine medication usually makes her feel better, and that the Symbicort she was

taking for asthma limited her symptoms. *Id.* Finally, he noted that they would discuss problems with her left knee at a subsequent visit if the pain had not resolved. *Id.* at 521.

On May 3, 2019, Dr. Orellana examined Ms. Santiago at Hartford Healthcare and noted that she was experiencing back pain, neck pain, muscle aches, joint stiffness, asthma, and insomnia. *Id.* at 849.

On June 13, 2019, Dr. Orellana saw Ms. Santiago for a follow up appoint to discuss her asthma, migraines, leg pain, and insomnia, among other things. *Id.* at 855. For her migraines, Dr. Orellana prescribed medication and referred her to Neurology. *Id*. He also noted that her asthma was moderate but stable. *Id.* He prescribed Oxycodone her leg pain and informed that she will need a pain management referral. *Id.* Dr. Orellana noted Ms. Santiago's insomnia was "stable," but that her hematuria symptoms required a Urology referral. *Id.*

On December 17, 2019, Dr. Orellana saw Ms. Santiago for a follow-up on her lower back pain and insomnia, and he refilled her Oxycodone and other prescriptions. *Id.* at 873. Dr. Orellana noted that she was experiencing fatigue, and headaches in addition to the chronic pain. *Id.* at 874.

On February 24, 2020, Dr. Erlich saw Ms. Santiago at St. Mary's Health Center for chronic migraines, chronic joint and back pain, fibromyalgia, insomnia, anxiety, and depression, among other conditions and symptoms. *Id.* at 765. Her asthma was poorly controlled, likely because she recently had the flu and her Symbicort medication lapsed, and her migraines were not improving despite her prescription medication. *Id.* Lastly, Dr. Erlich recommended conservative management for her left knee and noted that an injection would be considered if it does not get resolved. *Id.* at 766.

On March 12, 2020, Dr. Leon, at the UCONN Health Department of Internal Medicine, saw Ms. Santiago for a follow-up visit for chronic low back pain that radiated from her "L spine to paraspinal areas, on bending and turning." *Id.* at 938. She also had decreased range of motion, tenderness, and back spasms. *Id.* at 940. She was diagnosed with chronic bilateral low back pain without sciatica and the doctor stated that she will "begin weaning off . . . [O]xycodone," while simultaneously increasing her muscle spasm medication as needed. *Id.*

On May 21, 2020, Dr. Erlich saw Ms. Santiago to follow up about her back pain, obesity, and medications. *Id.* at 769. He believed the most effective treatment for her back pain would be physical therapy, but that it had been delayed due to COVID-19 restrictions. *Id.* at 770. He emphasized that pain in the lower back is "difficult to eliminate . . . entirely," and that the goal was better functionality.  *Id.* For her obesity, Dr. Erlich recommended back exercises and a nutrition referral. *Id.*

On August 17, 2020, Dr. Leon treated Ms. Santiago for restless leg syndrome, class II obesity, and bilateral edemas in her legs. *Id.* She was prescribed medication for each ailment. *Id.*

On September 24, 2020, Dr. Ramos treated Ms. Santiago in the Emergency Department of Waterbury Hospital for chest pain, dizziness, and back pain that radiated to her right upper abdomen. *Id.* at 1006. Her symptoms were described as consistent with cholecystitis, and a clinical correlation was recommended. *Id.* at 1028. She was discharged the day after she was admitted to the emergency department. *Id.*

On October 2, 2020, Dr. Leon saw Ms. Santiago for worsening back pain, as well as foot pain and restless leg syndrome. *Id.* at 1121. At this visit, Dr. Leon noted she had "decreased concentration." *Id.* at 1122.

On November 3, 2020, Dr. Leon had a follow up visit with Ms. Santiago. *Id.* at 1113. He noted that her restless leg syndrome was improving., and that her lower back pain was improving with physical therapy, medication, and the transcutaneous electrical nerve stimulation ("TENS") device. *Id.* at 1113–14.

Ms. Santiago had physical therapy appointments at Access Rehab Centers on several occasions during November 2020. *Id.* at 1052–53, 1057, 1073. Ms. Santiago's lower back pain made her "unable to perform much exercise," but the physical therapist noted that her rehabilitation potential was good. *Id.* at 1053. On one occasion, Ms. Santiago specifically sought physical therapy because she fell in her bathtub, which caused more back pain. *Id.* at 1057.

On December 7, 2020, Dr. Leon saw Ms. Santiago at UConn Health for worsening low back pain that radiated to her right leg. *Id.* at 1108. The doctor noted that the pain was triggered by standing and by sitting for a while. *Id.* Ms. Santiago also exhibited decreased range of motion and tenderness in her back. *Id.* at 1111.

On December 8, 2020, Ms. Santiago had physical therapy at Access Rehab Centers. *Id.* at 1077. The physical therapist noted that Ms. Santiago reported intense pain and that she had "difficulty with all exercises" during her session. *Id.*

On December 16, 2020, Dr. Nighat Hussain at the UCONN Health Department of Podiatry saw Ms. Santiago for her foot pain. *Id.* at 1103. She was diagnosed with tarsal tunnel syndrome on her right side, bursitis in her right ankle and foot, plantar fasciitis in her right foot, an equinis deformity in both feet, and a heel spur in her right foot. *Id.* at 1106. The doctor, citing a need to decrease her level of pain, required her to use a walker for two weeks and prescribed her a steroid pack and pain medication. *Id.*

### ii. Psychiatric Treatment

In addition to her physical ailments, Ms. Santiago has been seeking regular psychiatric treatment.

On August 17, 2018, Dr. Aura Ardon at St. Mary's Health Center saw Ms. Santiago to discuss medication management for schizoaffective disorder. *Id.* at 573. Ms. Santiago was hallucinating, anxious, and distractible. *Id.* Ms. Santiago reported that she had been experiencing hallucinations "for a long time" and that "she has seen . . . people since she was a child." *Id.*

On September 21, 2018, Dr. Ardon saw Ms. Santiago for a follow up for schizoaffective disorder and medication management. *Id.* at 580. Ms. Santiago was assessed to have schizoaffective disorder and post-traumatic stress disorder ("PTSD"). *Id.* Ms. Santiago's hallucinations, including "seeing dead people[,] ha[d] not resolved" despite her taking "multiple psychotropic medications." *Id.*

On October 16, 2018, a social worker at St. Mary's noted that Ms. Santiago's mental health had regressed, including auditory hallucinations and suicidal thoughts. *Id.* at 598–599. Ms. Santiago had not attended the group therapy her social worker recommended. *Id.* at 598.

On November 20, 2018, Dr. Ardon saw Ms. Santiago for a medication management visit. *Id.* at 600. The doctor noted that "even though the patient reports that she is hearing voices . . . the patient is organized [and] well directed." *Id.* at 603. No changes in her medication were recommended. *Id.*

On January 15, 2019, Dr. Ardon saw Ms. Santiago for anxiety and hallucinations, noting that "even though [Ms. Santiago] is on a long acting antipsychotic injection and has been on multiple medications" she "continued to [have] auditory and visual hallucinations." *Id.* at 604. Ms. Santiago reported issues with sleep and appeared to be anxious and distractible during the

appointment. *Id.* at 606–07. The doctor again stated that "for the most part [Ms. Santiago] is organized and goal directed." *Id.* at 607.

On January 16, 2019, Ms. Santiago went to St. Mary's because she was "feeling anxious and having on and off auditory hallucinations." *Id.* at 609. While Ms. Santiago did "appear somewhat anxious[,]" "for the most part she [was] organized and goal directed." *Id.*

On March 14, 2019, Dr. Ardon saw Ms. Santiago for medication management for schizoaffective disorder. *Id.* at 613. Ms. Santiago reported that she was having difficulty sleeping. *Id.*

On October 14, 2019, Ms. Santiago transferred her mental health care to the Wheeler Clinic. *Id.* at 712. During her intake appointment, Ms. Santiago reported symptoms of depression, anxiety, and hallucinations. *Id.* at 705. Ms. Santiago stated that she "only sleep[s] four hours a day," and that she is "always worried, nervous, and unsettled." *Id.* On her Daily Living Activities Assessment ("DLA-20"), however, Ms. Santiago was noted to be "within normal limits" across all fields. *Id.* at 712–13.

On November 6, 2019, during an appointment at Wheeler Clinic, Ms. Santiago reported that she not been taking her medication for two weeks and that she was "seeing things, hearing things[,] and [having] thoughts of hurting [her]self." *Id.* at 702. Her social worker recommended increased supervision from her mother and Ms. Santiago's husband, and that Ms. Santiago "go to Saint Mary's Hospital emergency room to get back on medication." *Id.*

On November 21, 2019, a nurse at Wheeler Clinic completed a psychiatric evaluation of Ms. Santiago. *Id.* at 688. Ms. Santiago reported that she wanted treatment to be focused on her depressed mood and PTSD. *Id.* She was told to continue her medication treatment of Wellbutrin, Oxcarbazepine, Propranolol, and Paxil to treat her depression, anxiety, and PTSD. *Id.* at 694.

Finally, on her Patient Health Questionnaire ("PHQ-9"), which examines the extent and severity of depression, Ms. Santiago scored a 12, which was interpreted as moderate depression. *Id.* at 696.

On December 12, 2019, during an appointment at Wheeler Clinic, Ms. Santiago reported that she had "only been hearing voices once a week which is better than last time [she] was [t]here." *Id.* at 685. Ms. Santiago said that being back on her medications was a "big help." *Id.*

On December 19, 2019, a nurse at Wheeler Clinic saw Ms. Santiago for medication management. *Id.* at 680. Ms. Santiago reported that she felt less depressed and anxious. *Id.* Despite this, she stated that she felt "despondent," reported that she "installed a camera in her bedroom" to "check that she was not being touched at night," and was having "severe nightmares." *Id.* at 681–82. The nurse noted that Ms. Santiago was likely experiencing increased symptoms because she is "actively doing trauma work in therapy." *Id.* at 682.

On January 8, 2020, a social worker at Wheeler Clinic saw Ms. Santiago for a psychotherapy follow up. *Id.* at 675. Ms. Santiago reported that "sometimes [she] ha[s] thoughts of wanting to die but they go away." *Id.* Her mood was described as depressed, but her score on the DLA-20 was within normal limits across all fields. *Id.* at 677.

On January 29, 2020, during an appointment at Wheeler Clinic, Ms. Santiago reported that she had been "very sad, anxious, concerned[,] and restless lately." *Id.* at 670. Ms. Santiago reported that her psychotic symptoms had been getting worse within the past two weeks as her father was dying. *Id.* She reported that her siblings are pressuring her to go visit their father, but she doesn't want to do it. *Id.* at 670.

10

On February 11, 2020, Ms. Santiago had a follow-up psychiatric appointment. *Id.* at 665. The social worker noted that Ms. Santiago's "risk factors" include depression, hallucinations, and history of suicide attempts and that her overall risk level was "moderate." *Id.* at 667.

On February 18, 2020, during a psychiatric follow-up and medication management at the Wheeler Clinic, Ms. Santiago reported that her prescribed medications were not effective because she was still depressed, anxious, paranoid, hypervigilant, and experiencing visual hallucinations. *Id.* at 661.

On February 28, 2020, a social worker at Wheeler Clinic saw Ms. Santiago for psychotherapy and a behavioral treatment plan update. *Id.* at 656. Ms. Santiago reported that she was angrier since her medication change, and that she was experiencing new hallucinations and having more panic attacks. *Id.*

On April 1, 2020, during a medication management appointment at the Wheeler Clinic, the nurse determined that Ms. Santiago's PTSD-related symptoms were "poorly controlled." *Id.* at 652. Ms. Santiago reported anxiety, difficulty concentrating, excessive worry, and depression, among other symptoms. *Id.* Ms. Santiago also reported that she was no longer experiencing auditory hallucinations, but that her anxiety and panic was "overwhelming." *Id.* at 654.

On April 2, 2020, a social worker at Wheeler Clinic assessed Ms. Santiago, who Ms. Santiago reported that she was "going through a hard time, with this virus and my husband left me last week." *Id.* at 647. Her mood was noted to be depressed and she stated she had "been having a lot of panic attacks." *Id.* at 647–48. Ms. Santiago also reported having suicidal thoughts. *Id.* at 647. The social worker scheduled a follow-up for the next week due to the "elevated risk." *Id.*

On May 1, 2020, Ms. Santiago had a telehealth visit at Wheeler Clinic. *Id.* at 630. Ms. Santiago reported that "her 23 year old son attempted to kill her with a knife and she had to call the police" and that the auditory hallucinations were "getting worse." *Id.* The social worker noted that Ms. Santiago "has not made any progress at this time due to recent stressful events" and, due to the increased risk, recommended an in-person session the following week. *Id.*

On May 5, 2020, a social worker at Wheeler Clinic conducted a telephonic session with Ms. Santiago. *Id.* at 626. Ms. Santiago reported that "she's still not doing well but is more calm than she has been lately." *Id.*

On May 12, 2020, after a telehealth session at Wheeler Clinic, the clinician noted that Ms. Santiago "continues to have worsening psychosis therefore no progress has been made." *Id.* at 965. Ms. Santiago agreed to have a medication management appointment because it seemed her medications were becoming less effective. *Id.*

On May 13, 2020, a nurse at Wheeler Clinic saw Ms. Santiago for medication management. *Id.* at 715. Ms. Santiago reported a worsening of depression and presented with restlessness, anxious and compulsive thoughts, depressed mood, difficulty concentrating, excessive worry, hallucinations, little interest or pleasure in doing things, paranoia, and racing thoughts. *Id.* at 716–17. The nurse noted that Ms. Santiago's depression was "aggravated by conflict or stress, social interactions[,] and traumatic memories." *Id.* at 715.

On June 18, 2020, during an appointment at Wheeler Clinic, Ms. Santiago reported that "she has been doing a lot better recently." *Id.* at 956. She stated that her medication "has decreased the voices a lot and [she is] able to function better." *Id.* Nonetheless, she was still hallucinating and presented as depressed. *Id.* at 956–57.

On June 22, 2020, Ms. Santiago had a telehealth medication management appointment at Wheeler Clinic. *Id.* at 951. Ms. Santiago reported "moderate" symptoms that occur daily and were "fairly controlled." *Id.* Her mood was "not good, but not bad." *Id.* Despite this, Ms. Santiago report that she was having "episodes," which include "hearing laughing, seeing shadows, [and] feel[ing] animals walking on her at night," as well as "hypervigilance, paranoia, restlessness, inability to sit still, nightmares, overeating, and fearfulness." *Id.*

On August 24, 2020, Ms. Santiago had an appointment to discuss medication management at which she reported moderate symptoms that were making "functioning . . .very difficult." *Id.* at 946. The clinician described Ms. Santiago's symptoms as "poorly controlled" because she "continues to report hallucinations, insomnia, anxiety, hypervigilance, nightmares, and mood fluctuations." *Id.* at 948.

On November 13, 2020, during a telehealth visit at Wheeler Clinic, Ms. Santiago reported that "[t]hings have been going well, my son has been with me so I have been sleeping better." *Id.* at 980. The clinician wrote Ms. Santiago "a letter for the housing authority to change her housing as her current housing is not constructive to her mental health and at times can worsen her hallucinations" due to her neighbors' loud music and stomping. *Id.*

On December 4, 2020, a nurse at Wheeler Clinic saw Ms. Santiago for a follow up visit. *Id.* at 971. Ms. Santiago reported feeling stressed and that her daughter and granddaughter were in the Intensive Care Unit due to a car accident. *Id.* She also reported that her hallucinations go away when she takes clonazepam, "but it always comes back which is frustrating." *Id.* Her nurse noted that Ms. Santiago "continued to make slow progress . . . trying new coping skills but continued struggles with hallucinations, anxiety, and depression." *Id.* at 971.

### 3.  Medical Opinions

On April 10, 2019, state agency reviewer, Dr. Robert G. Sutton, Ph. D. ("Dr. Sutton"),

made an initial determination that Ms. Santiago was not disabled within the meaning of the

Social Security Act. *Id.* at 78–88. In reaching this determination, Dr. Sutton noted Ms. Santiago's

long history of trauma including both physical and sexual abuse, along with her consistent

reports of auditory and visual hallucinations. *Id.* at 83. Despite this, Dr. Sutton found that "much

of her mental status finding are unremarkable and she is considered stable at her reported level

and not needing a higher level of care." *Id.* Furthermore, "her [activities of daily life]

descriptions shows that she shops, prepares meals, pays bills, reads Bible daily, [and] uses public

transportation." *Id.*

He found that Ms. Santiago was not significantly limited in understanding and memory,

the ability to carry out short, simple, or detailed instructions, the ability to perform activities

within a schedule, among other work-related factors. *Id.* at 84–86. He stated that Ms. Santiago

had sustained concentration and persistence limitations, understanding and memory limitations,

and social interaction limitations. *Id.* at 84. He also found that she was moderately limited in: the

ability to maintain attention and concentration for extended periods, the ability to work in

coordination or proximity to others without being distracted by them, and the ability to complete

a normal workday and workweek without interruptions from her mental health symptoms,

among other factors. *Id.* at 85–86.

Dr. Sutton noted that Ms. Santiago had "occasional problems with concentration and

pace," but "[s]he can carry through on simple instructions for up to two hours at a time

throughout an eight-hour day." *Id.* at 85. He cited three jobs that Ms. Santiago could still work at

despite her impairments: Assembly Machine Tender; Assembler of Small Parts; and Addresser. *Id.* at 88.

On May 29, 2020, Ms. Santiago's disability status was reconsidered by Dr. Adrian Brown, Ph. D. ("Dr. Brown"). *Id.* at 95–106. Here too, the doctor noted Ms. Santiago's long history of trauma and mental health issues. *Id.* at 96. He found Ms. Santiago had the following severe impairments: asthma; migraines; disorders of muscle, ligaments, and fascia; depressive, bipolar, and related disorders; and trauma and stressor-related disorders. *Id.* at 96–97. She also had non-severe gastrointestinal disorders and obesity. *Id.* at 97.

Dr. Brown found that Ms. Santiago would need to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. *Id.* at 101. He noted that Ms. Santiago had no significant limitations in the following areas: ability to carry out short and simple instructions; ability to perform activities within a schedule and maintain regular attendance; ability to sustain an ordinary routine without special supervision; ability to make simple work-related decisions; ability to ask simple questions or request assistance; ability to accept instructions and respond to criticism from supervisors; ability to maintain socially appropriate behaviors; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently. *Id.* at 102–04.

On the other hand, Dr. Brown found Ms. Santiago moderately limited in her ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or in proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from mental

health symptoms; ability to interact appropriately with the general public; ability to get along with coworkers or peers; and ability to respond appropriately to changes in the work setting. *Id.*

Dr. Brown specifically noted that Ms. Santiago "can carry out simple and repetitive tasks with necessary [concentration, persistence, and pace] for 2hr periods across a normal workday and work week without supervision," but that "[s]he could become overwhelmed by rapid work change" and was "[a]voidant and irritable at times." *Id. at* 103–04.

On July 13, 2020, another state agency reviewer, Dr. Marcia Foster, Ph. D. ("Dr. Foster"), assessed Ms. Santiago's physical capabilities and found that she could not lift more than 20 pounds occasionally or 10 pounds frequently while working. *Id.* at 99–101. Dr. Foster found that Ms. Santiago could stand, walk, or sit with normal breaks for a total of 6 hours in an 8-hour workday. *Id.* at 99. Ultimately, she opined that Ms. Santiago could work as an Addresser, Folder of Laundry, and a Small Products Assembler. *Id.* at 105.

### 4. Vocational Expert

Mr. Bopp, the vocational expert, testified during the hearing before the ALJ that there were jobs in the national economy for people similarly situated to Ms. Santiago. *Id.* at 51–52. Mr. Bopp said that such a person could work the following jobs: a power screwdriver operator, of which there were an estimated 250,000 full-time jobs nationally; a price marker, of which there were 120,000 full-time jobs nationally; and a collator operator, of which there were 40,000 full-time jobs nationally. *Id.* at 52. Each of these jobs are considered "light exertion." *Id.*

In response to Ms. Santiago's attorney's hypothetical about whether a person in these jobs would be allowed to be off-task 15% or more of the workday, Mr. Bopp said employers would not allow for that. *Id.* Mr. Bopp also said, however, that a worker who was 15% below average, "in itself, is not alone going to be a reason for dismissal." *Id.* at 53. When asked how

16

employers would treat someone who 15% of the time was "avoidant, irritable, [or] insubordinate," Mr. Bopp said that person would be precluded from competitive employment. *Id.*

### 5. ALJ Decision

On February 10, 2021, after thoughtful consideration of the entire record, the ALJ denied Ms. Santiago's claims. Tr. at 23–31. He made ten factual and legal conclusions in his decision:

1. The claimant has not engaged in substantial gainful activity since August 20, 2018, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairments: lumbar strain, morbid obesity, asthma, depression and anxiety (20 CFR 416.920(c)). . . .

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). . . .

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can carry out and remember simple instructions; can maintain attention on simple tasks for two-hour segments; can handle occasional interaction with co-workers and no interaction with the general public; needs to avoid concentrated exposure to airway irritants, such as fumes, gases and excessive temperatures. . . .

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on June 27, 1980 and was 38 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)). . . .

17

10. The claimant has not been under a disability, as defined in the Social
Security Act, since August 9, 2018, the date the application was filed
(20 CFR 416.920(g)).

*Id.* at 23–31.

As to Ms. Santiago's residual functional capacity, the ALJ found that her treatment record was largely unremarkable "apart from a history of mild asthma and sinusitis." *Id.* at 28. Additionally, the ALJ noted that "no acute respiratory problems have been identified" and that "doctors have only recommended conservative care, including physical therapy[,] . . . exercise, and weight loss." *Id.*

As to her mental health, the ALJ found Ms. Santiago's mental health records to be "relatively benign." *Id.* He said that Ms. Santiago's mental health issues appeared to be caused by "situational stressors involving family conflicts and increased anxiety dealing with the COVID 19 pandemic." *Id.* Moreover, he found "no evidence of any more than generally moderate symptoms resulting [in] mental status abnormalities." *Id.* at 29. Ultimately, the ALJ found that Ms. Santiago should be "limited only to simple instructions, no more than occasional interaction with coworkers[,] and no interaction with the general public." *Id.*

The ALJ reviewed the opinions of state agency reviewers, Dr. Robert Sutton, Ph. D. and Drs. Adrian Brown and Marcia Foster. *Id.* at 29–30. The ALJ found that Dr. Sutton's opinion was not persuasive because the evidence received following Dr. Sutton's review on April 10, 2019, including hearing testimony, "justifies a conclusion that claimant's impairments are more limiting than was concluded by the state examiners." *Id.* at 29.

The ALJ was persuaded by Dr. Brown and Dr. Foster in that Ms. Santiago could perform a limited range of light exertion and simple and repetitive tasks across a normal workday and

workweek without special supervision. *Id.* at 30. The ALJ found that Ms. Santiago would need to avoid concentrated exposure to fumes, odors, gases, and other irritants. *Id.*

The Appeals Council denied Ms. Santiago's request for review, finding that her reasons for disagreeing with ALJ Alger's decision "do not provide a basis for changing the [ALJ]'s decision." *Id.* at 1. As a result, ALJ Alger's decision became the final, appealable decision of the Commissioner sixty-one days after it issued. *Id.*

## B.  Procedural History

On October 26, 2021, Ms. Santiago filed a civil complaint against Kilolo Kijakazi, Acting Commissioner of Social Security, to appeal the ALJ's decision denying disability benefits. Compl., ECF No. 1.

On December 1, 2021, the Commissioner filed the relevant Social Security Transcripts. Tr., ECF. No. 8.

On March 3, 2022, Ms. Santiago moved to reverse the Commissioner's decision. Mem. in Supp. of Mot. to Remand or Reverse, ECF No. 14 ("Pl.'s Mot.").

On March 16, 2022, the Commissioner moved to affirm its final decision. Def.'s Mot. for an Order Affirming the Decision of the Comm'r. ECF No. 16 ("Comm'r's Mot.").

## II.    STANDARD OF REVIEW

To find disability under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." *Smith v. Berryhill*, 740 F. App'x. 721, 722 (2d Cir. 2018) (summary order) (citing 20 C.F.R. § 404.1505(a)).

In order to determine whether a claimant is disabled, the ALJ must follow a five-step evaluation process:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v)). In disability cases, "the claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four," *see Burgess*, 537 F.3d at 128 (internal quotation marks and citation omitted), but, with step five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (internal

quotation marks omitted) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). When "the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, 3:16-cv-1196 (VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

## III.   DISCUSSION

Ms. Santiago makes two arguments in support of her motion to reverse the Commissioner's decision.

First, Ms. Santiago argues that the ALJ erred in his review of the available medical opinions. Pl.'s Mot. at 7–12. Second, Ms. Santiago argues that the ALJ erred in his Residual Functional Capacity ("RFC") determination. *Id.* at 12–35.

The Court will address each argument in turn.

### A.  The Medical Opinions

The regulations regarding the evaluation of medical opinions were amended for claims filed after March 27, 2017, such that the "Treating Physician Rule"[2] no longer applies. *See*

---

[2] The "Treating Physician Rule" gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5867–68 (Jan. 18, 2017); *see also* 20 C.F.R. § 404.1520c, 416.920c. Therefore, Ms. Santiago's application, which was filed in August of 2018, is subject to the new regulations.

Under the new regulations, the ALJ must "evaluate the[] persuasiveness" of each medical opinion based on the opinion's "supportability" and "consistency," as well as the doctor's relationship with the claimant, specialization, and "other factors." 20 C.F.R. §§ 404.1520c(c), 416.920c(c). Although the ALJ is no longer required to assign a specific "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." *Id.* §§ 404.1520c(a), (b)(1), 416.920c(a), (b)(1).

While the ALJ is not required to specifically discuss each of the factors, the ALJ must expressly consider "the supportability and consistency factors." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2) ("[S]upportability . . . and consistency . . . are the most important factors . . . [and] [t]herefore, [the ALJ] will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions . . . in your determination."); *Vellone on behalf of Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) ("[I]n cases where the new regulations apply, an ALJ must explain his/her approach with respect to the first two factors when considering a medical opinion."), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021). "[T]he articulation requirements in [the] final rules" are intended to "allow a . . . reviewing court to trace the path of an adjudicator's reasoning." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017).

For the supportability factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). For the consistency analysis, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2).

"An ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). The court, however, need not remand the case if the ALJ only committed harmless error such that "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

Ms. Santiago argues that the ALJ did not properly explain his decision to rely on Dr. Brown's opinion or his decision to find Dr. Sutton's opinion not persuasive. Pl.'s Mot. at 7. More specifically, Ms. Santiago argues that there is no reason why the ALJ considered Dr. Brown's opinion to be demonstrably different from Dr. Sutton's opinion because both opinions "found 'moderate' impairments in seven of the same areas of functioning." *Id.* at 8.

Ms. Santiago further argues that portions of Dr. Brown's opinion are not supported by the record and the opinion also relies on misstatements of the record. *Id.* For example, the opinion found that Ms. Santiago was stable despite medical records in November of 2019 and April 2020 that indicated her PTSD was poorly controlled and medical records throughout 2019 and 2020

that showed "improvement of some symptoms, but an increase in others," including increased hallucinations. *Id.* Ms. Santiago also argues that Dr. Brown's statement that Ms. Santiago "is accustomed to" her hallucinations such that she is "not disturbed by them in any way" is not supported by the evidence because her medical records and testimony indicate that Ms. Santiago has placed cameras all over her house, that she "does not sleep a lot at night because she's afraid of the dark," and she reported increased hallucinations as late as May 2020. *Id.* at 10.

Ms. Santiago argues that "there is no supportable reason" for the ALJ's "acceptance" of Dr. Brown's opinion and "disregard" of Dr. Sutton's opinion. *Id.* at 11. Therefore, in Ms. Santiago's view, "the ALJ made his RFC determination in the absence of supporting medical opinion," which means that the ALJ "improperly substituted his own opinion for that of a physician, and . . . committed legal error." *Id.*

In response, the Commissioner argues that substantial evidence supports the ALJ's evaluation of the medical opinions. *See* Def.'s Mot. at 4. The Commissioner emphasizes that "the ALJ was not limited to merely choosing between two opinions, but instead could parse through the medical reports, making necessary decisions about which medical findings to credit, and which to reject," and therefore, "the RFC need not perfectly correlate to a functional assessment from any medical source." *Id.* at 4–5. In the Commissioner's view, the ALJ did not disregard Dr. Sutton's opinion or accept Dr. Brown's, but instead, "evaluated each [opinion] in terms of its respective supportability and consistency with the entire record." *Id.* at 6. Additionally, the Commissioner argued that Dr. Brown's opinion, relying on "thirteen additional months' worth of evidence," imposed "greater limitation[s]" than Dr. Sutton's opinion. *Id.* at 7–8.

The Commissioner further argues that the ALJ's RFC was ultimately "more restrictive" than both medical opinions. *Id.* The Commissioner emphasizes that the ALJ's RFC was based

24

not only on the medical opinions, to the extent they were supported by the record, but also by the extensive medical records. *Id.* at 6–7.

The Court disagrees.

As it relates to Dr. Sutton's opinion, the ALJ summarized his findings and found that Dr. Sutton's assessment was not persuasive because "additional medical evidence received in the course of developing [Ms. Santiago's] case for review at the hearing, as well as evidence in the form of testimony at the hearing, consistent with medical evidence in the record justifies a conclusion that [Ms. Santiago's] impairments are more limiting than was concluded by" Dr. Sutton. Tr. at 29.

Here, the ALJ addresses both the consistency and supportability of Dr. Sutton's opinion by finding that the opinion is not based on all of the relevant evidence in the record, specifically the medical records and testimony gathered after Dr. Sutton gave his opinion in 2019 (supportability), and finding that the medical evidence showed that Ms. Santiago's condition was "more limiting" than Dr. Sutton concluded (consistency). *Id.* This is a sufficient, albeit brief, discussion of persuasiveness, as required by the new regulations. *See, e.g.*, *Jacqueline L. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 2, 10–11 (W.D.N.Y. 2021) (affirming the ALJ's review of medical opinions because he "explained his findings regarding the supportability and consistency for each of the opinion, pointing to specific evidence in the record supporting those findings"). This conclusion is also based on sufficient evidence because Dr. Sutton's opinion was drafted on April 10, 2019, Tr. at 86, and Ms. Santiago submitted medical records of her care through December 2020 which included additional descriptions of her hallucinations and mental health needs, *id.* at 971.

As for Dr. Brown's opinion, the ALJ stated that he was "generally persuaded" because, "[w]hile . . . mindful that the[] opinion[] [was] from non-examining and non-treating expert sources," it was "not inconsistent with the medical evidence as a whole." Tr. at 30.

Unlike the ALJ's discussion of Dr. Sutton's opinion, it is not clear whether or how the ALJ analyzed the persuasiveness factors for Dr. Brown's opinion. As it relates to consistency, a conclusory statement that the opinion is or is not consistent with the "evidence as a whole" does not provide the reviewing court with enough information to determine if the underlying reasoning was proper. *See, e.g.*, *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 586 (S.D.N.Y. 2022) (finding the ALJ did not properly assess consistency where the ALJ stated an opinion was "consistent with and supported by the mental status examinations throughout the record" but "offered no direction as to which examinations").

For supportability, the ALJ failed to explicitly address whether Dr. Brown's opinion was properly supported by the record, which amounts to a legal error. *See, e.g.*, *Warren I. v. Comm'r of Soc. Sec.*, No. 20-CV-860506, 2021 WL 860506, at \*4 (N.D.N.Y. March 8, 2021) (remanding because the ALJ "failed to discuss what, if any, objective medical evidence and/or supporting explanations," supported the conclusions of the primary medical opinion on which he relied) (internal quotations omitted); *Brianne S. v. Comm'r of Soc. Sec.*, No. 19-CV-1718, 2021 WL 856909, at \*5 (W.D.N.Y. March 8, 2021) (finding legal error because the ALJ "did not examine what [the opining doctors] used to support their opinions and reach their ultimate conclusions"). More specifically, the ALJ should have discussed what evidence Dr. Brown used to support his opinion to determine whether it was sufficient. *See Jackson*, 588 F. Supp. 3d at 586–87 (finding error where "the ALJ did not address the extent to which NP Herman's opinion is supported by her findings and treatment history").

26

Additionally, even if the ALJ had adequately explained his reason for finding Dr. Brown's opinion persuasive, this conclusion is not supported by substantial evidence. More specifically, the ALJ found that the medical evidence showed that Ms. Santiago's conditions were more limiting than Dr. Sutton concluded. Tr. at 29. Dr. Sutton's and Dr. Brown's opinions, however, differed in only two respects. First, Dr. Sutton found that Ms. Santiago was "not significantly limited" in following detailed instructions, Tr. at 85, while Dr. Brown found that Ms. Santiago was "moderately limited" in following detailed instructions, Tr. at 103. Second, Dr. Sutton found that Ms. Santiago was "moderately limited" in accepting instructions and responding to criticism from a supervisor, Tr. at 86, while Dr. Brown found that Ms. Santiago was "not significantly limited" in this category, Tr. at 103. In other words, Dr. Brown, after reviewing an additional year's worth of medical evidence, found Ms. Santiago was more limited in one category and less limited in another category, as compared to Dr. Sutton's findings. The ALJ seemed to identify this inconsistency when he found that he was "not persuaded by the administrative findings of fact made by the state agency physicians." Tr. at 29.

Despite noting that Dr. Sutton's opinion did not accurately identify the limiting nature of Ms. Santiago's conditions and that neither state agency physicians' factual findings were persuasive, the ALJ's RFC ultimately aligned almost exactly with Dr. Brown's opinion. More specifically, the ALJ concluded that Ms. Santiago is able to "perform light work . . . except she can carry out and remember simple instructions; can maintain attention on simple tasks for two-hour segments; can handle occasional interaction with co-workers and no interaction with the general public; needs to avoid concentrated exposure to airway irritants." *Id.* at 26. Similarly, Dr. Brown concluded that Ms. Santiago was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods of time; perform

27

activities within a schedule; work in coordination with others; complete a normal workday and workweek without interruptions from psychologically based symptoms (noting also that Ms. Santiago could perform "simple and repetitive tasks" for two hour periods of time); interact appropriately with the general public; get along with coworkers or peers; and respond appropriately to changes in the workplace. *Id.* at 103–04.

As the ALJ alluded to when he noted that he was "not persuaded by the administrative findings of fact made by the state agency physicians," *id.* at 29, and explicitly found when reviewing Dr. Sutton's opinion, *id.*, the medical evidence suggests that Ms. Santiago's mental conditions are more limiting than Dr. Brown's opinion concluded. For example, Dr. Brown concluded that Ms. Santiago was not significantly limited in her ability to "respond appropriately to criticism from supervisors." *Id.* at 103. Yet, the medical evidence suggests that Ms. Santiago was often angry or irritable, *see e.g., id.* at 656, 670, and her hallucinations were exacerbated and/or triggered by stressful events, *see, e.g., id.* at 715, 971. Notably, there is no evidence in the record to suggest Ms. Santiago is more capable of interacting with supervisors than with the general public or coworkers, so it is not clear why Dr. Brown and the ALJ determined that Ms. Santiago needed limitations for interactions with the general public and coworkers but not supervisors.

Dr. Brown also stated that Ms. Santiago has auditory and visual hallucinations "which she is 'accustomed to' and she is not disturbed by them in any way." *Id.* at 98. The medical evidence, however, indicates that Ms. Santiago was, at times throughout the two years of relevant medical records, experiencing hallucinations every day, *id.* at 951, and, in February of 2020 she reported a new type of olfactory and tactile hallucination as well as increased panic attacks, *id.* at 656. While the ALJ noted that Ms. Santiago's "hallucinations and other symptoms

are triggered and/or exacerbated by increased stress," *id.* at 29, in adopting Dr. Brown's opinion, the ALJ failed to fully address Ms. Santiago's ability to respond to workplace stressors, such as a supervisor's criticism.

Finally, in light of the insufficient medical opinions before the ALJ and the nature of Ms. Santiago's claimed disability, the ALJ's duty to develop the record was "particularly important." *Craig v. Comm'r of Social Security*, 218 F. Supp. 3d 249, 268 (S.D.N.Y. 2016) ("The duty to develop the record is particularly important where an applicant alleges [s]he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace."). "Where mental health disorders are at issue, obtaining opinions from treating mental healthcare professionals is also especially important because mental impairments are 'not susceptible' to certain diagnostic tools used to evaluate physical impairments." *Telesco v. Comm'r of Soc. Sec.*, 577 F. Supp. 3d 336, 354 (S.D.N.Y. 2021) (citing *Flynn v. Comm'r of Soc. Sec.*, 729 F. App'x 119, 122 (2d Cir. 2018)).

Here, the ALJ noted that "the record does not contain any opinions from treating or examining physicians . . . in the treatment records," and specifically found it significant that no treating physician placed "restrictions" on Ms. Santiago. Tr. at 29. This conclusion, however, fails to account for the fact that Ms. Santiago was not employed at the time she was receiving treatment, *see id.* at 689, so it is not clear what relevant restrictions the ALJ expected to find in the treatment records. Notably also, Ms. Santiago's clinician at Wheeler did "provide[] [her with] a letter for the housing authority to change her housing as her current housing is not contusive [sic] to her mental health and at times can worsen her hallucinations." *Id.* at 980. Therefore, on remand, the ALJ needs to develop sufficient record evidence of the impact of Ms. Santiago's mental health, if any, on her ability to adapt to the stress of the workplace.

29

Accordingly, the Court will remand the case on these grounds.

### B.  The Residual Functional Capacity Determination[3]

Step Five of the disability analysis shifts the burden to the Commissioner "to show there is other work that [the claimant] can perform." *Brault*, 683 F.3d at 445. When assessing whether there are significant numbers of jobs in the national economy, "[a]n ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion[.]'" *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983)); *see Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 114 (2d Cir. 2010) ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment.").

At Step Five of the disability analysis, the ALJ relies on the claimant's RFC, which is defined as "what an individual can still do despite his or her limitations." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (internal quotation omitted). "Ordinarily, the RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." *Id.* The RFC must be "based upon all of the relevant evidence . . . [including the claimant's] ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." 20 C.F.R. § 220.120(a).

---

[3] In light of the Court's discussion of the medical opinions above, the Court will not address Ms. Santiago's arguments that the ALJ did not appropriately include her off-task behavior and ability to receive feedback from supervisors in the RFC because those issues relate to the ALJ's use of medical opinions and evidence, which the Court has already determined warrant remand. Instead, the Court will focus on Ms. Santiago's arguments related to education level and language abilities.

An ALJ must consider both a claimant's severe impairments and non-severe impairments in

determining the claimant's residual functional capacity. 20 C.F.R. § 416.945(a)(2); *De Leon v.*

*Sec'y of Health & Hum. Servs.*, 734 F.2d 930, 937 (2d Cir. 1984).

Ms. Santiago argues that, when applying the RFC at Step Five, "the ALJ . . . failed to

include . . . relevant non-exertional factors that mean[] the difference between a finding of

disabled, or not disabled." Pl.'s Mot. at 12. More specifically, Ms. Santiago argues that the ALJ

improperly instructed the vocational expert on her education level. *Id.* at 15. The ALJ found that

Ms. Santiago has a limited education based on reports that she had finished ninth grade before

dropping out of school. *Id.* Ms. Santiago argues, however, that she only finished sixth grade,

which would result in a finding of marginal education rather than limited education. *Id.* Ms.

Santiago emphasizes that she testified during the hearing that she completed sixth grade and that

this would be "consistent with her unfortunate life story." *Id.* Ms. Santiago argues that the ALJ

should have also considered her language abilities in conjunction with her education because

"the term education also includes how well you are able to communicate in English since this

ability is often acquired or improved by education." *Id.*

In response, the Commissioner argues that Ms. Santiago's testimony at the administrative

hearing "is the only evidence in the entire record supporting this assertion." *Id.* at 11. In the

Commissioner's view, "the balance of the record, including multiple reports to both medical

providers and Social Security personnel, all unanimously indicate that Plaintiff completed the

ninth grade." *Id.* The Commissioner emphasizes that "the ALJ, who is charged with resolving

conflicting evidence, . . . permissibly determined that Plaintiff had attained a limited, not

marginal, education level." *Id.* Finally, the Commissioner notes that Ms. Santiago testified that

she could not speak or understand English, but that on her disability application she stated she

31

could read and understand English and "during more than 30 medical visits" she "generally communicated in English." *Id.* at 11–12. In the Commissioner's view, Ms. Santiago has sufficient English language skills. *Id.* at 12.

The Court disagrees.

The relevant regulations define "limited education" as "a 7th grade through the 11th grade level of formal education" and "marginal education" as "a 6th grade level or less," but note that "the numerical grade level that [a claimant] completed in school may not represent [his or her] actual education abilities." 20 C.F.R. § 416.964(b). The ALJ must also consider the claimant's "ability to speak, read[,] and understand English" because "English is the dominant language of the country" and therefore "it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language." *Id.* § 416.964(b)(5).[4]

A claimant's education abilities are necessarily intertwined with her English language abilities. For example, in *Vega v. Harris*, the Second Circuit found the ALJ's "findings of fact . . . are inadequate with respect to [the claimant's] education." 636 F.2d 900, 903 (2d Cir. 1981). There, the claimant testified through an interpreter that she was able to understand English, but "[n]ot too much," that she occasionally used English in her prior job at a hotel, and that she completed less than four years of formal education in Puerto Rico. *Id.* at 904. The ALJ "did not determine . . . whether [the claimant] was literate and whether she was able to communicate in

---

[4] For cases filed after April 27, 2020, the Social Security Administration has updated its regulations to remove reference to 416.964(b)(5). *See* Removing Inability to Communicate in English as an Education Category, 85 FR 10586-01 ("We are finalizing our proposed regulations to eliminate the education category 'inability to communicate in English' when we evaluate disability claims for adults under titles II and XVI of the Social Security Act (the Act)."). Because Ms. Santiago's application was filed in August of 2018, "inability to communicate in English remains the correct standard for the instant case." *E.g.*, *Estrada v. Comm'r of Soc. Sec.*, No. 18-cv-3530 (KAM), 2020 3430680, at *7 n.1 (E.D.N.Y. June 23, 2020) (applying the English language standard to an application filed in July of 2015).

English," but nonetheless found that she was not disabled. *Id.* at 903–04. In concluding that remand for further proceedings was appropriate, the Second Circuit found that a "brief exchange" in English during the claimant's hearing was "not a substitute for a determination on the question of ability to communicate in English." *Id.* at 904. The court also found that "the fact that Vega apparently was able to communicate sufficiently to perform her hotel job does not necessarily mean that she can communicate well enough" to satisfy the regulations. *Id.*

Here, there is conflicting evidence about Ms. Santiago's education level and language abilities that the ALJ did not reconcile. Ms. Santiago testified during the hearing that she only completed sixth grade, Tr. at 42, however, multiple medical records indicate that Ms. Santiago completed ninth grade, *see e.g.*, *id.* at 574, 601, 689. It is also apparent from Ms. Santiago's medical records that her schooling was completed in Puerto Rico, as she did not move to the United States until she was 21 or 22 years old. *See, e.g.*, *id.* at 689. Despite this conflicting evidence, the ALJ summarily found that Ms. Santiago "has a limited education" without explaining his reasoning. *Id.* at 30.

Additionally, the ALJ did not explicitly address Ms. Santiago's English language abilities. Notably, Ms. Santiago testified at the hearing using a Spanish interpreter, *see id.* at 39. She also indicated on her disability application that she cannot speak and understand English, *id.* at 275, and during the hearing she stated that she did not understand much English, *id.* at 42. Ms. Santiago sometimes used an interpreter during her medical appointments, *id.* at 946, 948, 951, 1103, her treatment records sometimes indicated that she was Spanish-speaking, *id.* at 354, 412, 448, 466, 543, 604, 1029, she attended a Spanish-speaking intensive outpatient program, *id.* at 456, 477, and her prescriptions were dispensed in Spanish, *see, e.g.*, *id.* at 654–55. On her

disability application, she indicated that she can read and understand English and can "write more than [her] name in English." *Id.* at 275.

Here, Ms. Santiago's grade level was not clearly indicative of her actual educational abilities because there is conflicting evidence about what grade Ms. Santiago completed, Ms. Santiago's schooling was completed in Puerto Rico, she has not received any formal education in the United States, and there is insufficient evidence to determine the extent of Ms. Santiago's English language abilities, particularly her reading and writing abilities. Therefore, more than a conclusory statement that Ms. Santiago had limited education should have been provided. *See Sonia V. v. Comm'r of Soc. Sec.*, No. 5:18-CV-22 (ATB), 2019 WL 428829, at *8 (N.D.N.Y. Feb. 4, 2019) (remanding the case for further proceedings where the claimant had a bachelor's degree from the University of Puerto Rico because "the ALJ did not consider whether any of her formal education included English language courses" and evidence, including that the claimant needed an interpreter during numerous medical appointments and the Commissioner provided Spanish translation of important documents, "suggested that [the claimant] was unable to communicate in English").

Additionally, the ALJ's failure to adequately address Ms. Santiago's education and language abilities was not harmless. The ALJ instructed the vocational expert to determine whether someone the same age, education level, and work experience as Ms. Santiago could perform light work with some specific limitations. Tr. at 51. During the hearing, the ALJ did not solicit any testimony from Ms. Santiago about her ability to read and write in English and therefore, the vocational expert relied on Ms. Santiago's single statement that she could not understand "much" English, her testimony through an interpreter, and her testimony that she finished sixth grade, without noting where that education was completed. *Id.* at 42–50. The ALJ,

in his written decision, adopted the vocational expert's opinion, stating that Ms. Santiago's "ability to perform all or substantially all of the requirements of [light work] has been impeded by additional limitations" and therefore, "[t]o determine the extent to which these limitations erode the unskilled light occupational base, the [ALJ] asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and [RFC]." *Id.* at 30. The ALJ then adopted the recommended occupations the vocational expert endorsed during the hearing. *Id.* at 31.

Because the vocational expert did not have sufficient evidence to determine if Ms. Santiago can speak, read, and write in English such that she can meet the Level 1 language requirements[5] of the suggested jobs, his opinion, which the ALJ adopted, was missing pertinent evidence. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1984) ("[A] vocational expert's testimony is only useful if it addresses whether the particular claimant, with his [or her] limitations and capabilities, can realistically perform a particular job."); *see also Torres v. Comm'r of Soc. Sec.*, No. 14–CV–6438, 2015 WL 5444888, at *11 (W.D.N.Y. Sept. 15, 2015) (finding error where "the record contains substantial information to suggest that [the claimant] is unable to communicate in English, which was largely ignored by the ALJ," despite "testimony that she could understand some English and that instructions at her previous job were provided in

---

[5] Each of these positions requires Level 1 English language abilities, which is defined as the following:

> Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.

> Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

> Speaking: Speak simple sentences, using normal word order, and present and past tenses.

*Negron v. Saul*, No. 19 Civ. 07547 (KMK) (JCM), 2021 WL 465768, at *27 n.25 (S.D.N.Y. Feb. 8, 2021) *report and recommendation adopted*, 2021 WL 1254426 (Apr. 5, 2021).

English"). Therefore, in light of the fact that the ALJ was not simply applying the medical-vocational guideline grids, but was instead explicitly relying on the vocational expert's opinion, this error was not harmless.

Accordingly, the Court will remand the case on these grounds.

**IV.    CONCLUSION**

For the reasons explained above, Ms. Santiago's motion is **GRANTED**. The Commissioner's motion is **DENIED**. The decision of the Commissioner is **VACATED** and **REMANDED** for rehearing and further proceedings in accordance with this Ruling and Order.

The Clerk of Court is respectfully directed to close the case.

**SO ORDERED** at Bridgeport, Connecticut, this 17th day of February, 2023.

        /s/ Victor A. Bolden
        Victor A. Bolden
        United States District Judge